UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DEREK MICHAEL BROWN,<br><br>    Petitioner,<br><br>  v.<br><br>T. FELKER, Warden,<br><br>    Respondent. | No. C 08-4842 LHK (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

## INTRODUCTION

This is a federal habeas corpus action filed pursuant to 28 U.S.C. § 2254 by a *pro se* state prisoner. For the reasons set forth below, the petition is DENIED.

## BACKGROUND

In 2005, an Alameda County Superior Court jury found Petitioner guilty of first degree felony murder. The trial court sentenced Petitioner to a term of twenty-six years to life in state prison. Petitioner filed the instant federal habeas action after he was denied relief from the verdict on direct and collateral state review.

Evidence presented at trial shows that in 2001, Petitioner, along with codefendants Jermaine Brooks and Anthony Brown (hereafter "Anthony"), shot and killed a security guard, James Miller, during the course of an attempted robbery of a "convenience" store. The state appellate court summarized the facts as follows:

> [Alex] was working as a cashier at the 7-Eleven store at 4720 MacArthur Boulevard in Oakland on October 31, 2001. Security guard James Miller and clerk Isayas Debessay were also present in the store about 10:30 p.m. when defendants entered . . .
>
> When [Petitioner] and Anthony came up to the register, [Petitioner] took beef jerky from the counter and paid with a five-dollar bill. Anthony was next to him. Alex placed the five-dollar bill in the cash register and took out $4.01 in change. After closing the register, Alex turned to his right because he felt there was something going on there. When he turned, Alex saw that Brooks was pointing a white-colored gun at Miller's head. Believing it was a robbery, Alex raised his hands and told Miller to give up his gun. Miller resisted and held Brooks's wrist with one hand. It appeared to Alex that Miller was trying to take the gun from Brooks.
>
> When Alex first saw the gun, Debessay was standing next to him. Debessay ran away to the store's office, and Alex backed away and ran behind a shelf. From behind the shelf, he saw [Petitioner] and Anthony move toward Miller. He saw one of the defendants trying to grab Miller's gun, but could only see his hand, not his face. The person tried once or twice to pull out the gun but was not successful. The altercation occurred near the front door. Seeing a chance to escape, Alex ran to the bathroom and closed the door. From the bathroom, Alex heard a single gunshot.
>
> Debessay waited a minute or two before coming out of the office, and then called 911. He saw Miller walking slowly out of the store. A tape of the 911 call was played for the jury. Debessay told the operator that somebody just shot "my security guard" and that "[h]e wants to rob us." Alex tells the operator, "We got robbing" by "three black people."

(Ans., Ex. O at 4–5) (footnote omitted). Miller later died.

As grounds for federal habeas relief, Petitioner (1) alleges that the prosecutor's use of her peremptory strikes was unconstitutional; and (2) asks this Court to review a sealed transcript to determine whether it contains information that may have been favorable to the defense.[1]

---

[1] Petitioner put forth a third claim in which he asked to join in the arguments raised in his co-defendants' petitions. This third claim was dismissed on initial screening.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412–13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

## DISCUSSION

### I. Challenges of Potential Jurors

Petitioner claims that the prosecutor used her peremptory challenges to strike three prospective jurors — identified as Jurors B., S., and F. — on the basis of race, thereby

violating his Sixth Amendment right to a jury. (Pet. at 6.) The relevant facts are as follows. Defense counsel objected to the prosecution's use of peremptory challenges against Jurors B., S., and F, who were the sole remaining African-American prospective jurors. The trial court asked the prosecutor to give her reasons for using her challenges:

[Juror B]

The prosecutor stated that she had numerous reasons for excusing Juror B. Juror B. was a single mother who had her first child at age 18 and her second at age 21, by different fathers. Although Juror B. had worked for the last 12 years in a relatively conservative environment — the clerk's office of a federal bankruptcy court — the prosecutor believed that Juror B. seemed to have a very nontraditional and "kind of counter cultural" lifestyle, based on her personal appearance and lifestyle choices. Regarding Juror B.'s personal appearance, the prosecutor cited her "red streakish hair." She believed Juror B. was "not someone who would be . . . a conservative juror that would convict somebody." The prosecutor was also concerned that Juror B. seemed "very eager" to get on the jury, because she had said she was "concerned about giving incorrect answers" and seemed not to be "completely candid about . . . her feelings."

The defense argued that some of the prosecutor's stated reasons were contradictory insofar as Juror B. was too eager to serve on the jury but Juror R. was too reluctant. The defense also challenged the portrayal of Juror B. as nontraditional in light of the fact that she worked for a federal court, had moved to a different community so her children could attend better schools, and described her spare time activities in her questionnaire response as staying at home with her daughters, going out with family and friends, and going to movies or church. The defense also noted that Juror B.'s hair color was "quite a common thing today."

The trial court stuck by its original ruling that defendants failed to make out a prima facie case of discrimination but commented that the issue was "much, much closer . . . as to [Juror B.] than it was as to [Juror R.].[2]"

. . . .

[Juror S.]

As to Prospective Juror S., the prosecutor asserted that she had been charged with felony welfare fraud and perjury in 2001, eventually pleading guilty to misdemeanor welfare fraud under a plea agreement. According to the prosecutor, Juror S. had implied that she was put in a diversion program, and was not forthright in disclosing that she had in fact sustained a criminal conviction and might have still been on probation. The prosecutor also stated that Juror S. admitted she would have a hard time applying the felony-murder rule to an aider and abettor, although she also indicated that she would be able to follow the law. The prosecutor pointed to several White male jurors whom

---

[2] The striking of Juror R. was not raised as an issue in the instant action.

she had excused for that same reason.

. . . .

[Juror F.]

As for Prospective Juror F., the prosecutor explained that she was a senior legal document specialist at a law firm and the prosecutor was concerned that the other jurors would tend to defer to lawyers or "quasi-lawyers" in deliberations. The prosecutor pointed out that she had previously excused a court administrator who was not an actual lawyer, but who had a juris doctor degree and whose wife was a lawyer, because it was her practice to excuse all "lawyers, semi-lawyers, [and] quasi-lawyers on the panel." She also expressed concern about Juror F.'s view that, according to statistics she had learned about in her political science classes, the criminal justice system treats minorities unfairly. The prosecutor stated that Juror F. had initially denied holding any negative views of the criminal justice system when she first began to probe her on that subject. As further reasons, the prosecutor expressed concern that Juror F. "perhaps oversees and possibly critiques" the work of attorneys, and might scrutinize the prosecutor's work. According to the prosecutor, when she had jokingly asked Juror F. whether she disliked attorneys, Juror F. had not denied it. Finally, the prosecutor was concerned that Juror F. seemed to be falling asleep for most of that afternoon's proceedings and "perhaps was not interested in the whole process."

The defense contended that Juror S. was candid in her answers about her criminal history and may have simply misunderstood the precise disposition of her prior case. The defense also challenged the prosecutor's assertion that she excused all prospective jurors who, like Juror S., questioned the fairness of felony-murder liability for an aider and abettor, noting that Juror No. 8, who was ultimately seated as a juror, raised similar concerns. As for Prospective Juror F., the defense argued that she said nothing to indicate any antipathy to attorneys. She had her eyes closed at times, as did many of the prospective jurors, but she was not sleeping.

(Ans., Ex. O at 12–15) (footnotes removed).

The state appellate court rejected Petitioner's *Batson* claims. As to Juror B., the appellate panel found that the trial court could reasonably have found that the prosecutor's stated reasons for excusing Juror B. were genuine. (*Id.* at 18.) The prosecutor contended that Juror B. had a nonconformist or nontraditional lifestyle as evidenced by her red streakish hair and her having had children by two different fathers at a young age and her never having been married. (*Id.*) It also rejected defense counsel's assertion that Juror B.'s family arrangements were similar to those of a person seated as an alternate juror. (*Id.* at 19.) The alternate juror had lost touch with his daughter when she was 17 years old, and had had no contact with her for several years, and thus was not similar to Juror B. (*Id.* at 18–19.)

As to Juror S., the state appellate court found that the record supported the prosecutor's reasons that Juror S. had been criminally prosecuted, and that she had expressed "significant reservations" about applying the legal rules on aider and abettor liability, an issue of great importance to the case at hand. (*Id.* at 19.) The court rejected as unpersuasive Petitioner's assertion that the prosecutor did not challenge other jurors who expressed similar reservations about aider and abettor liability. (*Id.* at 20.) These other jurors, the court stated, had not, unlike Juror S., been criminally prosecuted, and had milder reservations about applying the aider and ability theory of criminal liability. (*Id.*)

As to Juror F., the state appellate court rejected as unpersuasive Petitioner's claim that the prosecutor did not consistently apply her professed policy of striking lawyers and semi-lawyers. According to the prosecutor, Juror F. fell into the category of quasi-lawyers because she currently worked as a senior legal document specialist at a law firm. (Ans., Ex. O at 14, 20–21.) Possibly comparable jurors, such as Juror T., Juror A.T., and Juror 7, lacked such a strong connection to the legal profession, as the state appellate court discussed. Juror T., who had worked for a sheriff's department 20 years earlier for about two years and had both testified and worked as a bailiff for part of that two-year period, was not comparable. (*Id.* at 21.) If anything, Juror T.'s background made him appealing to the prosecution, and in fact, the defense excused him. (*Id.*) Juror A.T. was not comparable because he had left a career in criminal justice eight years earlier and was now employed as an airline pilot. (*Id.*) Juror No. 7 was not comparable because his job as a political consultant for campaigns for judges and district attorneys "does not present nearly the same risk of being attributed with special expertise by fellow jurors" as Juror F., whose professional career consists of assisting lawyers in handling legal cases. (*Id.* at 21.) Also, Juror F.'s opinion that the criminal justice system treats minorities unfairly "further distinguished" her from other jurors. (*Id.*)

The use of peremptory challenges by either the prosecution or defense to exclude cognizable groups from a petit jury may violate the Equal Protection Clause. *See Georgia v. McCollum*, 505 U.S. 42, 55–56 (1992). In particular, the Equal Protection Clause forbids the

challenging of potential jurors solely on account of their race. *See Batson v. Kentucky*, 476 U.S. 79, 89 (1986). *Batson* permits prompt rulings on objections to peremptory challenges pursuant to a three-step process. First, the defendant must make out a prima facie case that the prosecutor has exercised peremptory challenges on the basis of race "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Id.* at 93–94. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. *Id.* at 97; *Wade v. Terhune*, 202 F.3d 1190, 1195 (9th Cir. 2000). Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Batson*, 476 U.S. at 98; *Wade*, 202 F.3d at 1195. A federal habeas court need not dwell on the first step of the *Batson* analysis if the matter has proceeded to the second or third step. "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant has made a prima facie showing becomes moot." *Hernandez v. New York*, 500 U.S. 352, 359 (1991).

To fulfill its duty, the court must evaluate the prosecutor's proffered reasons and credibility in light of the totality of the relevant facts, using all the available tools including its own observations and the assistance of counsel. *Mitleider v. Hall*, 391 F.3d 1039, 1047 (9th Cir. 2004). A legitimate reason "is not a reason that makes sense, but a reason that does not deny equal protection." *Purkett v. Elem*, 514 U.S. 765, 769 (1995). What matters is the "genuineness of the motive" behind the racially-neutral explanation, not "the reasonableness of the asserted nonracial motive." *Id.* In evaluating an explanation of racial neutrality, the court must keep in mind that proof of discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. *See Hernandez*, 500 U.S. at 355–62. It also should keep in mind that a finding of discriminatory intent turns largely on the trial court's evaluation of the prosecutor's credibility. *Rice v. Collins*, 546 U.S. 333, 340–42 (2006).

The findings of the state trial court on the issue of discriminatory intent are findings of fact entitled to the presumption of correctness in federal habeas review, *see Elem*, 514 U.S. at 769, as are the findings of the state appellate court, *see Mitleider*, 391 F.3d at 1050; *Williams v. Rhoades*, 354 F.3d 1101, 1108 (9th Cir. 2004). Under AEDPA, this means that a state court's findings of discriminatory intent are presumed sound unless a Petitioner rebuts the presumption by clear and convincing evidence. *Miller-El*, 545 U.S. at 240. A federal habeas court may grant habeas relief only "if it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge." *Rice*, 546 U.S. at 338–41.

Applying these legal principles to the instant matter, the Court concludes that Petitioner has not rebutted the presumption that the state court's conclusion was a reasonable one, as demonstrated by an analysis under the relevant case law. The Court need not dwell on the first step of the *Batson* analysis, whether Petitioner made a prima facie case, because (a) the prosecutor offered racially-neutral explanations for striking Jurors B., S., and F., and (b) the trial court ruled on the ultimate question of intentional discrimination. With respect to the second *Batson* step, the Court finds nothing in the record that would support a finding that the prosecutor's decision was based on constitutionally offensive considerations. As the state appellate court found, the prosecutor's stated reasons for the peremptory challenges were supported by the record. As for Juror B., the record supports the prosecutor's stated reasons that Juror B. had a nontraditional lifestyle based on her hair color, and on her not having married even though she had two children by two different fathers at a young age. As for Juror S., the record supports the prosecutor's stated reasons that Juror S. had been criminally prosecuted and had expressed reservations about applying aider and abettor liability, a theory of criminal liability central to the trial. As to Juror F., the record supports the prosecutor's stated reason that Juror F., a senior legal document specialist at a law firm, had sufficient legal experience to be excluded pursuant to the prosecutor's policy of excluding lawyers and semi-lawyers. As to the third *Batson* step which queries whether there was intentional discrimination, Petitioner has not shown clear and convincing evidence to

rebut the presumption that the trial court's determination was correct, or shown why this Court should favor Petitioner's interpretation of the record over the trial court's credibility determination.

A comparative juror analysis, which was conducted by the state appellate court in its review of Petitioner's claims, further supports this conclusion. The record supports the state appellate court's conclusions that the jurors who may at first glance have appeared similarly situated to Jurors B., S., and F. were in truth not similarly situated, and Petitioner has not offered any persuasive evidence to the contrary. As noted above, Juror B. was differently situated than the alternate juror in that there is a difference between being unmarried and the mother of two children by two different fathers at a young age, and a man who had lost touch with his daughter when she was 17 years old and had had no contact with her for several years. Juror S. was not similarly situated to other jurors who also had expressed reservations about applying aider and abettor liability in that those who had expressed reservations had not, unlike Juror S., been criminally prosecuted, and had milder reservations than Juror S. Juror F. was not similarly situated to other jurors in that she currently worked in the legal profession as a senior legal document specialist at a law firm. Taking all this into account, the Court concludes that Petitioner has not shown that his constitutional rights were violated. Accordingly, Petitioner's claim is DENIED.

## II. Confidential Informant

Petitioner asks this Court to review a sealed transcript of a March 30, 2005 *in camera* hearing conducted by the trial court in order to determine whether the transcript contains information regarding a second informant, and whether that information would have been favorable to the defense. (Pet. at 6.) What follows is the state appellate court's description of the relevant facts, and the court's ruling:

> In November 2002, Anthony's counsel filed a motion for an order compelling the disclosure of the identities of informants relied upon by the police in their investigation. The accompanying declaration of counsel specified that there appeared to be two confidential informants mentioned in Sergeant Longmire's follow-up investigation report. One of the informants, referred to as "X" in

> Longmire's report, was later identified as Chandler. Longmire wrote the following about an apparent second informant to whom he did not give a letter designation: "The informant told me that the suspects are from the 55th Avenue area. The informant was only able to provide me with the initials of 'D' & 'G.' The informant said the suspects were arguing over who shot Miller. The informant also said the suspects share the 9mm pistol that was used to kill Miller." [Petitioner] joined in Anthony's motion, arguing that the informants could possibly provide evidence that [Petitioner] did not know either of his codefendants had a gun. In February 2003, Deputy District Attorney Daniel Burke filed the prosecution's opposition, which referred only to informant "X." Burke argued that there was no reasonable possibility that the informant could exonerate any defendant.
>
> At the initial hearing on the motion in February 2003, the court and defense counsel expressed doubt as to whether there were in fact one or two informants. The court announced its intention to order disclosure of the informant "who overheard conversations amongst the defendants or between defendants about their roles in the crime." Burke immediately requested an in camera hearing, and the court granted the request. In April 2003, the court held another hearing on the motion to disclose, following an in camera hearing. The prosecutor informed the court that he had provided the name of Dwayne Chandler to the defense and that Chandler was the only informant he was aware of.
>
> Nearly two years later, during the cross-examination of Sergeant Longmire, the defense learned that there was in fact a second confidential informant, whom Longmire had interviewed on the day before he interviewed Chandler. The defense immediately filed a motion seeking alternatively to dismiss the charges, to grant a new trial, or to order disclosure of the confidential informant and grant a continuance, contending that the undisclosed informant could have provided exculpatory evidence for one or more of the defendants. At a hearing on the defense motion, the court decided that it needed time to look into the matter, but declined to interrupt the trial for that purpose. Later that day, the court instructed the jury and counsel began presenting arguments to the jury.
>
> After the jury returned its verdicts, the trial court held an in camera hearing with Sergeant Longmire [on March 30, 2005] in order to determine — for purposes of the pending defense motion — whether the second informant might possibly provide exculpatory evidence. The court concluded that the informant could not provide such evidence, and denied the defense motion.
>
> All defendants have joined in requesting this court to review the sealed transcript of the in camera hearing and to independently determine whether the confidential informant could possibly provide material evidence favorable to one or more of the defendants. We have done so and find nothing in the transcript of the in camera hearing to indicate that the informant might be able to provide exculpatory evidence as to any of the defendants. Equally, we are unable to discern any possible motivation that the prosecution would have had to knowingly conceal the existence of the second informant from the defense.

(Ans., Ex. O at 54–56.)

In response to an order from this Court, Docket No. 19, Respondent has filed under seal a copy of the transcript of the March 30, 2005 *in camera* hearing conducted by the trial court. The Court has reviewed the transcript, and concludes that it contains nothing that is, or would have been favorable to, Petitioner's defense. Insofar as Petitioner is making a claim that the prosecution failed to disclose favorable evidence material to guilt or punishment, such claim is DENIED. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963).

## CONCLUSION

The state court's adjudication of the claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Accordingly, the petition is DENIED.

A certificate of appealability will not issue. Reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Petitioner may seek a certificate of appealability from the Court of Appeals.

The Clerk shall enter judgment in favor of Respondent and close the file.

**IT IS SO ORDERED.**

DATED: March 15, 2011

_____
LUCY H. KOH
United States District Judge